**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 11:10 AM March 29, 2012**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| STARK CERAMICS, INC., | ) | CASE NO. 06-61101 |
| | ) | |
| Debtor. | ) | JUDGE RUSS KENDIG |
| | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT FOR PUBLICATION)** |
| | ) | |

Now before the court is the First and Final Application for Compensation for Attorneys for Debtor-in-Possession and Request for Authority to Pay Approved Fees from Retainer ("Application"). The Application was filed on March 20, 2008 and was held in abeyance pending the filing of the chapter 7 trustee's ("Trustee") final report. Richard G. Zellers and Melody Dugic Gazda ("Counsel") were counsel for Debtor during the chapter 11 phase of this case and seek $88,630 for services rendered. Two objections were filed, one by the unsecured creditors' committee on April 8, 2008 and one by Trustee on February 20, 2012. A hearing was held on May 27, 2008. Further opportunity for hearing was provided but no requests for additional hearing were filed.

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## FACTS

Debtor, founded in 1909, was a manufacturer of ceramic glazed brick and tile products and was "the world's largest producer of structural glazing (sic) facing tile for interiors." (App. To Employ Buckingham, Doolittle & Burroughs, LLP, doc. 76, ¶ 4). As with any case, multiple factors influenced Debtor's chapter 11 filing on June 29, 2006, but one of the key pressures involved its deteriorating relationship with the largest secured creditor, FirstMerit Bank, N.A. ("FirstMerit"). Prepetition, Debtor borrowed money from FirstMerit and later defaulted on the notes. On April 24, 2006, FirstMerit obtained a $2,035,500.36 judgment, plus interest and costs, in the Stark County Court of Common Pleas. On the same day, FirstMerit filed a judgment lien, which was assigned to American First Federal, Inc. ("American First Federal") in March 2007. Prior to the judgment lien, Debtor's real estate was unencumbered.

After seeking bankruptcy protection, Debtor operated as a debtor-in-possession and negotiated use of FirstMerit's cash collateral to continue operations. As part of the final cash collateral order, FirstMerit's judgment lien was deemed perfected. Although a window to challenge the lien was provided in the final cash collateral order, the only effort to challenge the lien was rejected by this court. (Simon v. American First Federal, Inc. (In re Stark Ceramics, Inc.), Case. No. 06-61101, Adv. No. 07-6259 (Bankr. N.D. Ohio November 12, 2010)). Consequently, unsecured creditors were denied any recovery from a substantial asset, the real estate.

Debtor's case was contentious from the outset. Throughout the case, there were accusations that the reorganization process was used for the benefit Debtor's insiders via a sale to an investor group, which purportedly included insiders, at a discounted rate. Less than two months after the case was filed, FirstMerit filed a motion to dismiss or convert the case. Relying on Debtor's turnaround specialist, FirstMerit argued that the only chance for reorganization was through "the immediate sale of Debtor's business or Debtor being able to sell its excess kiln capacity." (M. to Dism., doc. 96, ¶ 4). Alternatively, Debtor would face liquidation. Counsel for Debtor confirms this in the reply[1] filed to the fee application. While Debtor repeatedly referenced an imminent sale, and a § 363 motion was filed on November 30, 2006, a sale was never finalized. On December 5, 2006, the court granted an oral motion to appoint a chapter 11 trustee. On March 27, 2007, the case converted to chapter 7.

The chapter 7 trustee's final report gives a glimpse of the dismal outcome of this case, which is administratively insolvent. Trustee has a mere $151,800.11 in receipts, which is sufficient to pay chapter 7 administrative fees and expenses in full. The funds remaining after

---

[1] The pleading is titled Response to Objection of David O. Simon, Chapter 7 Trustee, to First and Final Application for Compensation for Attorneys for Debtor in Possession.

2

the chapter 7 administrative expenses will provide less than eight percent on chapter 11 administrative expenses. The chapter 11 expenses include amounts incurred to produce product for a contract that Debtor anticipated receiving but was not executed. According to Trustee, the manufacturing specs of the product made the inventory nearly worthless. The result was increased chapter 11 administrative expenses with no corresponding benefit to the estate and minimal recovery to the administrative claimants. There will be no recovery to priority or unsecured claimants from estate funds.

Throughout the chapter 11 proceedings, Debtor was represented by Richard G. Zellers and Melody Dugic Gazda who, at the time of filing, were with the firm of Luckhart, Mumaw, Zellers & Robinson.[2] Their employment as counsel for Debtor was approved on July 13, 2006. The application stated that they had received a $20,000 prepetition retainer, which is supported by the Rule 2016 statement filed with the petition. Their fee application contradictorily states that they received a $27,000 prepetition retainer. The Statement of Financial Affairs indicates Debtor paid Mr. Zellers a total of $32,000 for debt counseling or bankruptcy within a year of the case filing.

Counsel requests a total of $88,630 in fees as payment of an administrative expense under 11 U.S.C. § 503(b). This represents 471.5 hours of work by Attorney Zellers at $170.00 per hour ($80,155), and 56.5 hours of work by Attorney Gazda at $150.00 per hour ($8,475). According to the application, $18,653 of the $27,000 was applied to prepetition fees. An additional $1,039 was used to pay the chapter 11 filing fee, leaving a balance of $8,347 in Counsel's trust account.[3]

## ARGUMENTS

The official committee of unsecured creditors ("Committee") objected to the fee application, raising numerous arguments. From a procedural standpoint, the Committee contends there was a defect in the appointment, there is an improper disclosure regarding the prepetition retainer, and the application does not conform to the requirements for fee applications in this district. On a more substantive basis, the Committee claims Counsel's loyalties were divided during its representation of Debtor and that the services did not benefit the estate.

The chapter 7 trustee also takes issue with the fee application, pointing to the failed

---

[2] It appears Mr. Zellers and Ms. Gazda are now associated with Richard G. Zellers & Associates.

[3] There is a mathematical inconsistency in the figures provided by Counsel. $27,000 - $18,653 - $1,039 = $7,308, not $8,347, which is the amount that reportedly remains in Counsel's IOLTA trust account. The difference is the amount of the filing fee. On his final report, Trustee states Counsel's claim is $80,283, which would be the difference between the amount requested ($88,630) and the amount purportedly remaining in the IOLTA account ($8,347).

3

chapter 11 case. Trustee posits that Counsel failed to meet its burden of proof and did not demonstrate the reasonableness of the fee request, especially considering the results obtained. As key support, he references the appointment of a chapter 11 trustee approximately five months after the case was filed and the subsequent cessation of operations and conversion to chapter 7, as well as incurrence of unnecessary administrative expenses. The thrust of his position is that the lack of success of the case influences the amount of compensation to which Counsel is entitled.

In turn, Counsel's reply places the blame for the dismal outcome on the shoulders of the unsecured creditors. Counsel claims that a refinancing deal with a group of investors was close to finalization but failed when the unsecured creditors demanded an ownership interest in the business. Counsel also contends that the unsecured creditors maintained an unrealistically high valuation of the business which ultimately doomed the investor plan to fail. Additionally, Counsel disclaims culpability for the accrual of unnecessary administrative expenses associated with the anticipated contract, suggesting criticism is more appropriately directed to the consultants who were operating the business or the untimely conversion to chapter 7.

## ANALYSIS

Although post-petition compensation is an administrative expense pursuant to 11 U.S.C. § 503(b)(2), the actual award of post-petition compensation is founded in 11 U.S.C. § 330(a). At its core, § 330 permits a court to award "reasonable compensation for actual, necessary expenses" to a professional employed under 11 U.S.C. § 327. 11 U.S.C. § 330(a)(1). Section 330 contains very specific guidance in determining what is reasonable. Section 330(a)(3) outlines several factors applicable to a court's contemplation of the reasonableness of a compensation request:

> the court shall consider the nature, the extent, and the value of such services, taking in to account all relevant factors, including--
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services where necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue, or task addressed;

4

<blockquote>
(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
</blockquote>

The first two statutory considerations, the time and rate, are the heart of the lodestar analysis, the methodology approved by the Sixth Circuit for determining the reasonableness of a fee request. *See* Boddy v. U.S. Bankr. Court (In re Boddy), 950 F.2d 334, 337 (6th Cir. 1991). The lodestar is the product of the reasonable hourly rate for the services and the reasonable time spent on such services. Id. at 337 (citations omitted). Determining the reasonable rate and hours is influenced by multiple factors, including those set forth in § 330(a)(3) and others outlined and adopted in Boddy. Id. at 338 (citing Harman v. Levin (In re Robertson), 772 F.2d 1150, 1152 n.1 (4th Cir. 1985) (other citations omitted)). The requirement that both the hourly rate and time be reasonable create a lens for the court to use as a filter, providing an opportunity to adjust for services that do not meet the reasonable criterion.

Adjustments to fee requests are supported in § 330(a)(2), which permits a court to award less than the requested compensation. Section 330(a)(4)(A), by virtue of its outright disallowance of compensation, finds the following services to be inherently unreasonable, and therefore non-compensable:

<blockquote>
(1) unnecessary duplication of services; or

(2) services that were not--

    (i) reasonably likely to benefit the debtor's estate; or

    (ii) necessary to the administration of the case.
</blockquote>

In addition to the above, fee applications are also subject to localized procedural requirements under Local Bankruptcy Rule 2016-1.[4] Under that rule, applications must comply with the Guidelines for Compensation and Expense Reimbursement of Professionals ("Guidelines").

The court will review the application, the objections, and Counsel's response, against this

---

[4] This rule incorporated the requirements previously adopted by this district through General Order 93-1, which was effective at the time this case was filed.

back drop.

## I. General Order 93-1

Initially, the court finds that the application fails to comply with the compensation and reimbursement guidelines adopted through General Order 93-1.[5] The Committee also noted several deficiencies along the same lines. Many of the time entries are vague and lack definition. For example, billing for "review of correspondence from Attorney Hannabury" on September 28, 2006 gives the court no intimation of the underlying issue. The court could go to the docket and learn that Mr. Hannabury represented George C. Miller Brick Company, and could postulate that the communication may have related to a motion for relief from stay filed on September 12, 2006, but such postulation may misguided.

Similarly, there are multiple entries for generic descriptions including "work on files" and "review files." These entries are virtually meaningless and therefore it is impossible to determine if the time spent is reasonable. Services are lumped together almost incoherently. For example, the August 1, 2006 reads as follows:

> Meeting with Associates regarding schedules and
> utilities (.5), conferences with Inglewood (.3, .3.,
> .3, .2), receipt of correspondence from client (.3, .3,
> .2, .3, .2, .2), review and revise schedules (1.2), receipt
> and review of Inglewood presentation (.8), preparation
> for 341 examination (.5).

The multiple time entries for the same task, without any distinguishing characterization of the services, provides no context, making it nearly impossible for the court to understand whether 1.5 hours is reasonable for "receipt of correspondence from client." These entries are in derogation of General Order 93-1, which states that "[m]ere notations of telephone calls, conferences, research, drafting, etc., without appropriately identifying the matter involved, may result in disallowance of the applicable time." (General Order 93-1, ¶ 9).

The lumping problem is exacerbated by the poor breakdown in the billing categories. The services provided are divided into four categories: Business Operations/General Administration of Case, Disclosure Statement and Plan, FirstMerit Collateral Order, and Fees and Employment. Eighty percent of the application falls under the first heading. This alone suggests the application fails to efficiently and usefully separate and categorize the services.

General Order 93-1 required the following:

> The professional shall describe each Project, the

---

[5] A copy of General Order No. 93-1, effective July 28, 1993, is attached as Exhibit A.

> purpose and/or need for the services, significant
> problems encountered, results achieved, and pro-
> vide other relevant information for the Court to
> evaluate the services and time expended.  If the
> narrative is not divided into separate Projects, the
> services shall be described generally.

(General Order No. 93-1, ¶ 2).  This description is simply absent from the fee application.

A premier example of how the deficiencies impact review of the application can be understood when considering the potential sale of Debtor's assets. Anything related to the sale is lumped in to the Business Operations/General Administration of Case.  Counsel, in the response to the objections, argues that their sale efforts were hampered by the Committee's demands.  The court is simply unable to evaluate these statements within a clear frame of reference.  The application does not identify when the negotiations started or provide an overview of the amount of time involved.  There are dozens of entries which indicate Counsel had communications with Committee counsel, Anthony DeGirolamo.  However, the focus of those exchanges is a mystery. The exchanges could have been about operating reports, cash collateral, a potential sale, or other matters entirely.  Specific references to sale negotiations are scarce, at best.  The court found an entry on August 24, 2006 which references an "offer" that was submitted to Attorney DeGirolamo.  It would have been beneficial to know if that was related to potential sale negotiations or something else entirely.  The court cannot say with any certainty when the sale negotiations began, how long they lasted, or what amount of time was devoted to a potential sale.  The next entry which may be related to the sale is found more than two months later, on November 10, 2006, in which Attorney Zellers is billing for "receipt and review of binding letter of intent."  The gaps in the fee application are detrimental to Counsel's application because the applicant bears the burden of proving the reasonableness of the fees requested.  In re James Contracting Group, Inc., 120 B.R. 868 (Bankr. N.D. Ohio 1990) (citations omitted); Solomon v. Wein (In re Huhn), 145 B.R. 872 (W.D. Mich. 1992).  Without more definitive information, the court has been left to speculation and conjecture.

The court notes that services related to the post-petition use of utilities is also included under this category. Looking at the fee application, it appears that separating out this category would have been fairly easy.  And, with certain work separated in to distinct projects, it may have made the remaining entries more meaningful.  Instead, the court is left with the inability to decipher the nature of the services provided.

Also particularly troubling is the complete lack of billing for any time other than attorney time.  There are no paraprofessional hours billed.  At the hearing, Attorney Zellers confirmed that the firm does not bill for paraprofessionals.  However, the fee application is replete with entries for the attorneys to prepare correspondence, schedules and pleadings, which are items that generally would fall to non-attorney staff.  For example, on August 1, 2006, Attorney Zellers itemizes 6.3 hours to "prepare Schedules and Statement of Financial affairs."  This could have been attorney time appropriately spent on schedule issues or it could have been

administrative or paralegal time. It is unclear. As General Order 93-1 identifies, "partner rates are generally not allowable for routine work." The fee application also fails to comply with General Order 93-1 in that it does not contain the certification referenced in paragraph six. It also fails to justify the time spent in intra-office conferences, contrary to paragraph eleven. And it is unclear whether travel time was appropriately billed at half the billing rate as required by paragraph fourteen.

More than once during the hearing on the fee application, Attorney Zellers relied on past practice to defend the fee application, stating that he prepared the application in the same manner it had always been prepared and which was acceptable to this court's predecessor. This argument fails to move the court. There are clear guidelines for fee applications adopted in this district which Counsel is obligated to follow. Moreover, it is doubtful the previous applications drew the same degree of objection or were in cases of similar complexity and difficulty. Counsel assumes the risk for noncompliance.

Counsel's failures to comply with General Order 93-1 are marked and pronounced. Large portions of the application are amorphous. The failures to adequately describe the nature of the services rendered handicaps the court's ability to determine the reasonableness of the fees.

## II.     The lodestar

Arriving at a lodestar figure in this case is particularly difficult. While no one challenges the hourly rate of Mr. Zellers and Ms. Gazda, and the court has no issue with the hourly rates they charge in the fee application when applied to legal services that are properly billable by attorneys, an hourly rate of $150 - $170 is patently unreasonable for services which could have been rendered by a paraprofessional. This concern was noted above. Another concern is in a perceived failure to more fully utilize Ms. Gazda's services at a slightly lower billing rate. Almost ninety-six percent of the fee application is comprised of hours billed by Mr. Zellers. Although his hourly fee is reasonable, the court concludes that Counsel was not engaged in economical work-sharing between the billing attorneys.

Not only is the court tasked with determining which services warrant the billing at the attorney rates, it is also forced to divine whether the time expended on services is justified. The lack of specificity in the fee application outlined above directly hampers the court's ability to undertake this consideration. For example, Attorney Zellers billed a total of 2.40 hours on September 5, 2006 for the following:

> Receipt and review of correspondences from client (3)
> (.7), conferences with client (.3, .8), receipt and review
> of correspondence from Inglewood (.3, .3).

These services were rendered in an apparent vacuum. Without any context as to the nature of the correspondence, the topic it covered, or other detail, the court is left bewildered as to either necessity or reasonableness.

8

Many of the entries are also suspect. For example, there are several days for which Attorney Zellers billed in excess of seven hours. On August 24, 2006, he billed 3.00 hours under the Business Operations heading and billed 8.80 hours under the FirstMerit Collateral Order category. Both entries reference correspondence to Attorney DeGirolamo and it is unclear whether there was an overlap in services. Additionally, the court notes that at no point is there a single entry for the minimum billing increment of one-tenth of an hour, or six minutes, as provided in General Order 93-1. Instead, the smallest increment is two-tenths of hour. This is true for even a simple task such as review of a court order scheduling an emergency hearing, as noted on the December 5, 2006 entry. Additionally, as Attorney DeGirolamo pointed out at the hearing, if the attorney time is divided over the days between the case filing and the appointment of the chapter 11 trustee, it amounts to an astounding 4.4 hours per working day (Monday - Friday) in billed services.

The court accepts that $150 is an acceptable hourly rate for Ms. Gazda and that $170 is a reasonable rate for Mr. Zellers to charge when applied to legal services properly provided by attorneys. The identified problems with the fee application notably complicate the court's ability to accurately calculate the lodestar.

## III.     Case specific factors

Both the Committee and Trustee argue that the lack of success in this case should directly impact the compensation awarded Counsel. While confirmation is not the only benchmark of success in a chapter 11 case, the failure to confirm a plan subjects the requested fees to higher scrutiny. In re McLean Wine Co., Inc., 463 B.R. 838, 848 (Bankr. E.D. Mich. 2011) (citing In re Cardinal Indus., Inc., 151 B.R. 843, 847 (Bankr. S.D. Ohio 1993) (citations omitted)). And when reorganization is improbable, attorneys assume the risk that fee applications may be reduced or denied. In re Berg, 268 B.R. 250 (Bankr. D. Mont. 2001) (citations omitted). Generally, a court looks at whether services benefitted the estate in determining whether to allow the fees. 11 U.S.C. § 330(a)(3)(C).

Several factors lead to the court to conclude that this case was unlikely to succeed from its filing. The swift downfall of the case, from filing to the appointment of a chapter 11 trustee, in less than seven months, is telling. A plan of reorganization was never filed and it appears Debtor never had the support of the unsecured creditors for the sale motion filed on November 30, 2006, which was opposed by multiple parties. A week after the filing of the sale motion, the court appointed a chapter 11 trustee due to troubling concerns and the case converted to chapter 7 in March 2007. The operating report for the period ending November 30, 2006, just prior to the appointment of the chapter 11 trustee, shows that Debtor lost close to $1,000,000 since filing a chapter 11 petition.

The court also finds the sheer amount of time devoted to utility issues an omen as to the case's likelihood of success. The fee application reveals that substantial time was devoted to utility issues. Operation of the kilns was a substantial expense for debtor, as evidenced by the figures agreed to as adequate assurance. In October 2006, two major utilities filed a motion

9

seeking additional adequate protection because of Debtor's failure to comply with the existing agreement regarding utility payments, including adequate protection. Dominion East Ohio has a postpetition administrative expense claim for $235,010.26 and is scheduled to receive only $18,181.37 on that chapter 11 administrative expense claim. Quite simply, the inability to maintain necessary utility payments was a red flag as to the dire financial condition of Debtor.

Further, over $500,000 in administrative expense claims are itemized in the Trustee's final report, and the distribution on those claims is $38,280.49. The prime indicator of lack of success is the administrative insolvency, resulting in an incomplete recovery to administrative claimants and no distribution to priority or unsecured creditors. This is a relevant consideration in determining a fee award. Kemp, Klein, Umphrey, Endelman and May v. Veltri Metal Prod., Inc. (In re Veltri Metal Prod., Inc.), 189 Fed.Appx. 385 (6th Cir. 2006) (citing In re Thrifty Oil Co., 205 B.R. 1009 (Bankr. S.D. Cal. 1997)). However, it is not intended as an exclusive factor. Veltri Metal, 189 Fed.Appx. 385 (citing 11 U.S.C. § 330(a)(4)(A)(ii)(II)). In this case, the lack of recovery to the unsecured creditors is of consequential import and is particularly relevant.

Debtor entered this case with its biggest asset, the real estate, encumbered by a recent judgment lien. The lien had attached less than ninety days before the petition was filed, which likely was avoidable as a preference under 11 U.S.C. § 547. If the lien had been avoided, the outcome for the unsecured creditors would be materially different. Instead, in obtaining use of cash collateral, Debtor essentially put the asset beyond the reach of the unsecured creditors.[6] The purpose was to provide an opportunity for Debtor's reorganization. Debtor traded its sole, substantial unsecured asset for some time that was used to pursue a transaction opposed by unsecured creditors as self-serving. The court was convinced that the chances of reorganization were so slim it borders on foolhardy. Consequently, the loss to the unsecured creditors is substantial and directly related to Counsel's representation of Debtor during the reorganization phase of the case.

Not only are the unsecured creditors not receiving a distribution, but the distribution to unsecured claimants is diluted through the increased expenses added to the administrative expense pool with needless post-petition production of inventory. While Counsel wants to blame other parties, the fact is that Counsel was representing Debtor and had been instrumental in retaining multiple professionals to assist in the case. The production of inventory for a contract that was never formalized is inexplicable. Clearly, no benefit to the estate resulted, drawing in to question whether the associated fees are reasonable. McLean Wine, 463 B.R. 838 (citations omitted). The court cannot conclude that they were. However, it is impossible to determine from the fee application what time was expended dealing with this matter.

Finally, there were frequent allegations questioning Counsel's loyalty. The Committee repeatedly alleged that Counsel was representing the interests of Debtor's insiders over Debtor's

_____

[6] The court recognizes the Committee's acceptance and approval of the cash collateral order, so Debtor does not solely bear responsibility.

interests. This type of conflict can result in denial or disgorgement of compensation. *See, e.g.*, The Law Offices of Ivan W. Halperin v. Occidental Fin. Group, Inc. (In re Occidental Fin. Group, Inc.), 40 F.3d 1059 (9th Cir. 1994); In re Angelika Films 57th Inc., 227 B.R. 299 (Bankr. S.D.N.Y. 1998); Roger J. Au & Son, Inc. v. Aetna Ins. Co. (In re Roger J. Au & Son, Inc.), 64 B.R. 600 (N.D. Ohio 1986). The proposed asset purchase agreement ("APA") filed with the court shows that Debtor's principal, Lorraine G. Stewart, also was the principal who signed the APA on behalf of Stark Ceramics Acquisition Company, LLC ("Acquisition Company"), the potential purchaser. It also shows that Acquisition Company intended to assume various liabilities, including Debtor's liabilities to its attorneys. While this is concerning, and could place a shadow on Counsel's loyalties, the court finds it, standing alone, inconclusive on the existence of an actual conflict of interest.

## IV. Objections

The court addresses the Committee's objection as it relates to Counsel's employment under 11 U.S.C. § 327. The Committee suggests that the fee application inappropriately requests compensation for Attorneys Zellers and Gazda, not the firm of Luckhart, Mumaw, Zellers & Robinson. The court simply finds this argument specious. Reviewing the employment application and order, it is clear that both employment of both the individual attorneys and the firm was authorized. The fact that the application for compensation is for individually named attorneys is of no consequence.

The Committee makes a valid argument regarding to disclosure of the prepetition retainer. The record contains conflicting information about the amount of the retainer. It is unclear whether the prepetition retainer was $20,000 or $27,000 and how the remaining amount was calculated. Counsel will be instructed to clarify the amount before any fees are awarded. However, the court does not find the error to be egregious enough to warrant denial of all compensation. The retainer was disclosed and there is nothing in the record to suggest that it was anything other than a careless error by Counsel. *Cf.* Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.), 210 B.R. 844 (B.A.P. 10th Cir. 1997).

## V. Disgorgement

The objectors did not argue for disgorgement.

## CONCLUSION

The pervasive problems identified with the fee application are symptomatic of the case. The application was filed with seemingly little regard for the rules or the outcome. As a result, the court can unequivocally declare that Counsel failed to carry their burden in proving that the requested fees are reasonable.

As discussed above, it would be difficult to determine what constitutes reasonable compensation under these facts. However, at this juncture, it appears unnecessary to go through

the fee application with a line item veto pen. Because of the administrative insolvency, the potential recovery to Counsel is so small that reasonableness will be forcefully imposed. Looking at the final report, Trustee indicates that approximately $14,000.00 is at stake, representing the sum of the amount remaining in the IOLTA trust account and the amount that Trustee proposes distributing on the claim ($6,211.03). At Counsel's blended hourly rate of $167.86, this represents approximately eighty-three hours of work, which could be supported as reasonable. However, this would actually result in a windfall to Counsel because it would result in receipt of approximately sixteen percent, or twice as much, as the payout to other administrative claimants. That is clearly not reasonable or equitable and undermines the priority system of distribution set forth in the bankruptcy code. Consequently, the court will not authorize this amount. To keep payment on Counsel's administrative claim in line with the distribution to other unsecured claimants, Counsel's recovery on its claim will be limited to an amount that corresponds to the recovery of other similarly situated claimants. Counsel is authorized to retain the monies in the IOLTA account. No further distribution will be made on the claim by Trustee.[7] The amount to be recovered by Counsel is deemed reasonable.

In the event that estate assets are discovered or further distribution will be made, the court reserves the right to further review the fee application to determine the reasonableness of the balance of the compensation requested.

An order will be entered immediately reflecting the decision of the court.

\#       \#       \#

**<u>Service List:</u>**

Richard G. Zellers
Melody Dugic Gazda
Richard G. Zellers & Associates
3810 Starrs Centre Dr.
Canfield, OH 44406

David O. Simon
1370 Ontario Street
Suite 450
Cleveland, OH 44113-1744

Derrick Rippy ust11

---

[7] The $6,211.03 that Counsel is currently scheduled to receive from the estate will be redistributed among the remaining administrative claimants. As a result, the percentage paid on their claims will increase to just under nine percent. Counsel's recovery will be approximately 9.4%. The difference is sufficiently slight to obviate the need for exactness.

Office of the US Trustee
H. M. Metzenbaum U.S. Courthouse
201 Superior Avenue
Suite 441
Cleveland, OH 44114

Anthony J DeGirolamo
116 Cleveland Ave., N.W.
Suite 307
Canton, OH 44702

06-61101-rk    Doc 418    FILED 03/29/12    ENTERED 03/29/12 12:00:19    Page 13 of 25

FILED
JUL 28 AM 11: 41

CLERK U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
CANTON

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO

IN RE:                          )
                                )
GUIDELINES FOR COMPENSATION     )
AND EXPENSE REIMBURSEMENT        )
OF PROFESSIONALS                )
                                )
                                )   GENERAL ORDER NO. 93-1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Bankruptcy Judges for the Northern District of Ohio, having at their meeting on July 9, 1993, approved Guidelines for Compensation and Expense Reimbursement of Professionals and directed that such Guidelines shall be effective in all cases filed after August 1, 1993,

IT IS ORDERED that the Guidelines for Compensation and Expense Reimbursement of Professionals shall be effective as to all cases filed after August 1, 1993, and

IT IS FURTHER ORDERED that the Clerk of this Court prepare sufficient copies of the Guidelines for distribution to interested persons and that such copies be available at the offices of the Clerk in Akron, Canton, Cleveland, Toledo and Youngstown.

DATED: July 28, 1993

FOR THE COURT

_James H. Williams_
_____
JAMES H. WILLIAMS
CHIEF BANKRUPTCY JUDGE

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

## GUIDELINES FOR COMPENSATION AND
## EXPENSE REIMBURSEMENT OF PROFESSIONALS

The following Guidelines govern applications for compensation and expense reimbursement. The Guidelines cover the narrative portions of applications, time records and expenses. Except as otherwise provided, the Guidelines apply to professionals generally including lawyers, accountants, appraisers, auctioneers, financial advisors and consultants unless, for cause shown, modifications are made at the time a professional is employed.

## The Narrative

1.  Employment; Prior Compensation; Holdback

    The application shall state the date of the order approving applicant's employment, amount and deposit date of any retainer, the date of each prior request for compensation and the amount requested, approved and paid. Payment of interim fees allowed depends upon the estate's cash, status of the case and the interests of the debtor and creditors generally.

2. <u>Work Description; Projects</u>

Each application shall categorize the services rendered into separate projects or tasks ("Projects") unless payment of less than $5,000 is requested. Projects in an attorney's Chapter 11 application might include the use of cash collateral, financing, relief from stay matters, plan and disclosure statement, preferences, etc. Ordinarily a separate Project category should be established for any matter which required significant time.

The professional shall describe each Project, the purpose and/or need for the services, significant problems encountered, results achieved, and provide other relevant information for the Court to evaluate the services and time expended. If the narrative is not divided into separate Projects, the services shall be described generally.

A billing summary for each Project shall follow each Project description.

3. <u>Summary of Time Billed</u>

Each application shall include a billing summary showing (a) total hours billed to each Project,

- 2 -

(b) the composite hourly billing rate for the Project, and (c) for each professional charging time to the Project, his or her name, status (e.g., partner, associate, paralegal, manager), hourly rate, and hours billed. In applications not divided by Projects the billing summary shall cover all time billed. If initials are used to identify professionals, a key shall be provided.

4. <u>Preparation of Application</u>

Reasonable fees for preparation of a fee application may be requested. Applicant has the burden to prove the extent to which the preparation fees requested exceed those for clients who require detailed fee statements and have adopted fee review procedures.

5. <u>Staffing; Rates</u>

Rates charged must be commensurate with the skill required for the task. For example, partner rates are not generally allowable for routine work. Rates may be adjusted to conform with these Guidelines and applicable law notwithstanding an order approving rates at the time of employment.

6. <u>Certification</u>

Each application shall contain a certification by the responsible professional that (a) the professional has read the application, (b) to the best of the professional's knowledge, information, and belief formed after reasonable inquiry, the compensation and expense reimbursement sought conforms with these Guidelines, except as otherwise specifically noted in the application and (c) the compensation and expense reimbursement requested are billed at rates and in accordance with practices no less favorable to the debtor/estate than those customarily employed by applicant generally, except as otherwise specifically noted in the application.


<u>Time Records</u>

7. <u>Time Records Required</u>

All professionals shall keep accurate contemporaneous time records, except auctioneers, real estate brokers, appraisers, and any other professional whom the Court excuses from this obligation at the time of appointment. Notwithstanding the foregoing, the order of appointment may require auctioneers, appraisers, or real estate brokers to submit time records.

- 4 -

8. Increments

Professionals shall keep time records in minimum increments no greater than 6 minutes. Applications which contain minimum billing increments greater than .1 hour may be disallowed.

9. Entries

Time entries shall identify the person who performed the service, the date performed, matter involved and services rendered. Mere notations of telephone calls, conferences, research, drafting, etc., without appropriately identifying the matter involved, may result in disallowance of the applicable time. Time entries with unexplained abbreviations may be disallowed. If computer time sheets are submitted, an appropriate key shall be provided to facilitate review.

Applicant has the burden to show that services for which compensation is sought are for professional services only and not for services ordinarily performed by a trustee or debtor in possession.

10. <u>Lumping</u>

If separate tasks are performed on a single day, the fee application shall disclose the time required for each task (i.e., no "grouping" or "lumping").

11. <u>Conferences</u>

Professionals shall justify time spent in conferences with other professionals or paraprofessionals in the same firm. Failure to do so may result in disallowance of fees related to the conferences.

12. <u>Multiple Professionals</u>

Professionals shall justify the need for more than one professional or paraprofessional from the same firm at the same court hearing, deposition or meeting. Failure to justify this time may result in disallowance of fees.

13. <u>Office Tasks</u>

Time spent addressing, stamping and stuffing envelopes, filing, photocopying or "supervising" any of the foregoing is generally not compensable whether performed by a professional, paraprofessional, or secretary.

14. **Travel Time**

Travel time is ordinarily compensable at not more than one-half the professional's allowed hourly rate. Travel of one hour or less round-trip is not compensable.

15. **Filing Papers**

Time spent filing papers or pleadings is generally non-compensable.

## Expenses

16. **Receipts**

Receipts should be obtained for all expenditures. Receipts shall be retained and produced upon request for reimbursement of expenditures exceeding $25.00.

17. **Office Overhead**

Office overhead is generally not reimbursable. Overhead includes secretarial time or overtime, word processing time and cost of meals or transportation provided professionals and staff who work late or on weekends.

18. **Computerized Research**

Computerized research is reimbursable at actual cost. "Actual cost," in these Guidelines, means

- 7 -

the amount actually expended by the professional
or paid to a third party provider without markup
or enhancement for handling or administrative
charges.

19. <u>Professional Services</u>

A professional employed under section 327 of the
Bankruptcy Code may not employ or charge as an
expense services provided by another professional
unless employment of the second professional is
approved by the Court prior to the rendering of
services.

20. <u>Photocopies (Internal)</u>

Charges must be disclosed on an aggregate and per
page basis. Charges allowed are actual cost not
to exceed 20 cents per page.

21. <u>Photocopies (Outside)</u>

Actual cost.

22. <u>Postage</u>

Actual cost.

23. <u>Overnight Delivery</u>

Actual cost where shown to be necessary.

06-61101-rk    Doc 418    FILED 03/29/12    ENTERED 03/29/12 12:00:19    Page 22 of 25

24. **Messenger Service**

   Actual cost shown to be necessary. In-house messenger service is not reimbursable for more than the cost of comparable services outside the firm.

25. **Facsimile Transmission**

   Actual costs of telephone charges for outgoing transmissions are reimbursable. Transmissions received are reimbursable at actual cost not to exceed 20 cents per page.

26. **Long Distance Telephone**

   Actual cost.

27. **Travel - Automobile Transportation**

   Travel of one hour or less round-trip is generally not reimbursable. Travel expense for trips in excess of one hour round-trip is reimbursable in accordance with the allowance by the Internal Revenue Service - currently 28 cents per mile (IRC § 274(d) and the current applicable I.R.B. Announcement).

28. **Travel - Air Transportation**

   Reimbursement is limited to amount spent or regular coach fare whichever is lower.

- 9 -

29. <u>Travel Accommodations and Meals</u>

Reimbursement is allowed for reasonable hotel and meal expense. Luxury dining or accommodations are not reimbursable.

30. <u>Meals - Working</u>

Working meals at restaurants or private clubs are generally not reimbursable. Reimbursement may be requested for working meals only when food is catered to the professional's office during a meeting with clients, such as a creditors' committee, to permit the meeting to continue through a normal meal period.

31. <u>Amenities</u>

Charges for entertainment, alcoholic beverages, newspapers, dry cleaning, shoe shines, etc. are generally not reimbursable.

32. <u>Miscellaneous</u>

Filing fees, court reporter fees, witness fees, process service and UCC searches are reimbursable at actual cost.

33. <u>Special Practices</u>

The Court is aware that billing practices of professionals may differ. The court will consider

- 10 -

applicant's customary practice in charging or not charging other clients for particular items. If other clients are not billed for a particular item, the estate will not be billed. If an item is billed to all other clients, reimbursement should be sought at the least expensive rate the professional charges any client for comparable services or expenses.

Unless the Court otherwise requires, all objections to an application must be filed and served not later than five (5) working days prior to the scheduled hearing.